BARBARA ARTZ, Plaintiff, *v.* FRANCES TODD, as President of Tompkins County Farm and Home Bureau and 4-H Club Association, et al., Defendants.

NEAL E. ARTZ, Plaintiff, *v.* FRANCES TODD, as President of Tompkins County Farm and Home Bureau and 4-H Club Association, et al., Defendants.

Supreme Court, Trial Term, Onondaga County, January 17, 1948.

498

*Arthur Beach* and *George T. Driscoll* for plaintiffs.

*John H. Hughes* and *George S. Sullivan* for defendants.

SEARL, J. A jury has rendered a verdict for plaintiff Barbara Artz for $12,000; likewise a verdict of $130.50 in the derivative action of the father of Barbara Artz, who was an infant at the time she was injured.

The court granted a nonsuit as to defendant Cornell University. The verdict is against the remaining defendants.

While acting as a junior counsellor with the Campfire Girls near Danby, Tompkins County, New York, Barbara Artz fell through a trap door that had been left open on the porch of a caretaker's lodge, maintained upon a large tract of land used for recreational purposes.

The situation as here presented is novel so far as reported authorities are concerned. In April of 1940, the United States of America, under an agreement signed by Henry A. Wallace, Secretary of Agriculture, granted a license to Cornell University for the occupation of substantially 389 acres of land located in Tompkins County, New York. The same was in

·connection with the New York land project. The agreement provided that the university should use the property for the operation of an organized group camp, as well as for conservational or recreational purposes. The agreement also provided that the university be responsible for the operation, maintenance and administration of the property, but might, in turn, sublicense the property to carry out the purposes under which the license was granted to the university.

Subsequent thereto, and by an agreement executed by Cornell University in November, 1940, the university sublicensed the same premises to the treasurer of Tompkins County Farm and Home Bureau and 4-H Club Association. The terms of the sublicense provided that the association should be responsible for operation, maintenance and administration. Upon this property was located a small lake, a main camp for housing purposes and several other buildings. On the shore of the lake was a caretaker's cabin. A private telephone line connected this cabin with the main camp. A telephone instrument was located upon the front porch of the caretaker's cabin, which faced the lake. The porch was used for the storage of lifesaving equipment, oars and paraphernalia used for swimming purposes. Almost directly under the telephone instrument was a trap door which, when closed, constituted a part of the porch floor.

Chapter 308 of the Laws of 1939; being subdivision 28-a of section 12 of the County Law, as amended, relates to the administration of farm bureau, home bureau, and 4-H club work through county associations. Briefly, the act provides that the board of supervisors of any county may appropriate and pay out for the general improvement of agricultural and home conditions and for the support and maintenance of county farm and home bureaus and 4-H club work certain sums of money, provided that such sums be expended under an agreement to be entered into between the county association and Cornell University, as agent for the State. This statute further provides, that in each county which shall have qualified under the act to co-operate with Cornell University in conducting public work, there would be recognized and created a subordinate governmental agency, consisting of an unincorporated association of citizens of the respective county interested in agriculture, homemaking and community betterment, under a form of organization and administration approved by Cornell University as agent of the State.

In this instance, organized under such a plan, the Tompkins County Association permitted various organizations to use the buildings and grounds upon payment of agreed amounts, through 1941 and 1942, down to the date of this accident on July 8, 1942. Professor Lincoln D. Kelsey, of the College of Agriculture of Cornell University, served as secretary for the committee in charge of defendant association. He paid the bills, collected the rentals and hired the camp cook. He also hired Laurence C. Doll and his wife as caretakers. Doll received $100 for his services and the use of the caretaker's cottage. He supervised and had complete charge of the camp. The day before this accident occurred, the plumbing connections with a septic tank beneath the cottage became defective. Doll opened the trap door leading from the front porch to the basement for the purpose of ventilating the cellar. He testified that he placed a porch rocking chair in the opening, that the chair substantially filled the opening at 2:30 on July 8th; that he left to do some work in Ithaca and the chair was in the same place when he returned at 11:00 P.M. In the meantime Barbara Artz, then sixteen years of age, was acting as junior counsellor for the Campfire Girls. She guarded and instructed the girls while swimming in the lake. The caretaker's cabin was located on a bluff above the lake. Near the benches on the shore of the lake was a check board containing the names of all the Campfire Girls who used the lake for bathing. Before each girl went into the water, she would pull a ring on the check board that contained a slip bearing her name. When returning from the water, each young lady was instructed to reverse the ring, showing that she had left the water. This arrangement was for safety purposes. At the close of the swimming period, late in the afternoon in question, it was discovered that the name of one girl indicated she had not come from the water. The head counsellor sent Barbara Artz up the incline to the caretaker's cottage for the purpose of phoning the main camp to ascertain whether the missing girl had returned there. Running up the steps and onto the porch, she brushed against a chair, grabbed the receiver of the wall phone, and went into a hole. She landed on the cement cellar floor some seven feet below. She stated she had never used this phone before and did not know there was a trap door or opening in the floor. It was her claim that the wicker rocker obscured her view of any opening in the floor. It is self-evident that if the chair were placed in the opening, as claimed by Mr. Doll, plaintiff could not have gone through the opening without carrying the chair with her. This opening was twenty-four by twenty-eight inches.

At the close of the entire evidence, the court granted a non-suit as to defendant Cornell University. Clearly the university had parted with possession and control so as to effectually defeat any claim of negligence on its part. The mere fact that Professor Kelsey was an employee of the university and acted as well as secretary of the association, a distinct entity, could in no wise bind the university. He testified that he received no funds from the university, that expenses for maintenance of the camps were paid from rentals received for their use.

Plaintiffs urged that as the complaint charged nuisance as well as negligence, if the nuisance existed at the time Cornell subleased the premises to the association, the former could not escape liability. However, while the cover over the opening was closed and hooked, then being a part of the porch floor, no nuisance existed. True, the telephone instrument might have been placed other than in close proximity to the opening, but when there existed no opening, no dangerous condition existed. The opening in the floor could not well be termed an incipient nuisance. It could not well have been in the contemplation of the parties, at the time Cornell subleased the premises to the association, that Doll would raise the cover and leave the opening exposed (4 A. L. R. 740). Nor are the facts similar in *Prussak* v. *Hutton* (30 App. Div. 66). There the lessor knew the lessee was to use the premises for the storage of powder. An explosion followed, injuring plaintiff, who occupied a dwelling several hundred feet distant from the house where the powder was stored. The court instructed the jury that if they found the maintenance of the powder in proximity to other dwellings was a nuisance, it would constitute no defense that the powder was ignited and exploded by lightning. In the cited case, the lessor knew the premises were to be used to maintain a dangerous agency. In the instant case no danger could have been anticipated so long as the occupant kept the door closed. In other words, the mere existence of the trap door was not inherently dangerous.

Plaintiff also relied upon the language found in Ruling Case Law (Vol. 16, Landlord and Tenant, § 594, pp. 1076–1077) to effect that: " It is the well settled rule that the landlord is properly chargeable with liability to a stranger where the cause of injury to the latter is a nuisance existing on the premises at the time of the demise. * * * Nor is it material that the negligence of the lessee contributed to the injury ". The distinction between the rule just enunciated and relied upon by plaintiff and the instant situation is found in the language

of section 598: " Leases are made with a view to the use of the premises leased, and if the injury to the person or property of a stranger is the result of the reasonable, ordinary and contemplated manner of use of the premises, the lessor will be responsible therefor ". Here the lessor clearly would not reasonably be expected to contemplate or anticipate that the lessee would leave a trap door open on a porch floor, when it constituted a portion of the floor itself. It would be just as reasonable to contend that the officers of the municipality should contemplate that manhole covers on the sidewalk or highway would be removed and the openings left unguarded.

Another authority urged by plaintiff is *Holroyd* v. *Sheridan* (53 App. Div. 14, 15), where a barn, opening on the level of a sidewalk, was equipped with doors which, when opened, swung over a portion of the sidewalk. The court there held such condition constituted a nuisance. However, the decision was based upon a finding that the condition constituted " an infringement of the rights of the public ".

We must conclude, therefore, that Professor Kelsey was not acting for or in behalf of Cornell University in the management of the premises. No nuisance, as such, existed at the time of execution of the sublicense from the university to the association.

We now may consider the three remaining questions in the instant case; first was there proof of negligence on the part of the officers of the association, secondly, was Barbara Artz, plaintiff, guilty of contributory negligence, as a matter of law, and, were the damages awarded excessive in amount?

As to the negligence of defendant, it appears that Mr. Doll was hired to supervise the premises and that he knew the oars, swimming and lifesaving equipment were stored on the porch of the cottage. He knew that the counsellors came upon the porch to obtain and replace the equipment owned by the association. He knew the counsellors were permitted to use the telephone. On the undisputed facts, Barbara Artz was unquestionably an invitee. Assuming the version of placing the rocking chair in the opening was accepted as correct, still was Mr. Doll justified, for the sake of ventilation, in leaving the trap door open, knowing that young people were using the porch? On the question of negligence, there was sufficient evidence to require its submission to the jury.

As to the contributory negligence, we find an unusual condition existed. The young lady had been sent in haste by her superior to phone the main lodge. If the missing girl was not

there, seconds might well determine whether her life could be saved by search in the pond and her rescue effected. The principle that the law makes allowances for mistakes and errors of judgment which may happen in an emergency, or when one is running to effect a rescue, is well recognized. (*Lowery* v. *Manhattan Railway Co.,* 99 N. Y. 158; *Laufer* v. *Shapiro,* 210 App. Div. 436.) There was no evidence that this plaintiff had previous knowledge of the opening, for the cover apparently was flush with and constituted a portion of the porch floor. The jury determined this issue and their finding should not be disturbed.

As to the amount of damages assessed, we find that when the plaintiff was taken to the hospital the night of the injury, the X-ray photographs disclosed only the condition of the dorsal spine. After a short period of confinement in one of the cabins, the patient went about with some difficulty. However, she made a bicycle trip to and from Sandy Pond. Her back continued to pain her and in April, 1943, she visited Dr. Severance in Syracuse. An X ray of the lumbar spine revealed a compression of the body of the first lumbar vertebra. There was a kyphosis or malalignment of the back structure. There was a marked restriction of backward bending, which the doctor testified was still present. She has worn a corset over the lumbar spine and requires future medical treatment, as testified by the doctor. Dr. Potter, called by defendant, confirmed the findings of Dr. Severance to the extent that he found a fracture of the first lumbar vertebra and a permanent angulation of the spine.

In view of the seriousness of the injury, the court cannot disturb the verdicts.

Defendant's motion for a new trial is therefore denied.